STATE, RESPONDENT, *v.* VANDERVOORT, APPELLANT.

(No. 4,452.)

(Submitted April 9, 1920. Decided April 26, 1920.)

[189 Pac. 764.]

*Criminal Law — Homicide — Evidence — Sufficiency — Eye-witnesses.*

Homicide—Evidence—Sufficiency.

1. Evidence *held* sufficient to warrant a verdict of murder in the second degree, it showing that defendant, accompanied by his brother, went to the home of deceased, with whom they had a quarrel and against whom defendant had made threats that he would "get" or "fix" him, and killed him.

Same—Eye-witness—When State not Obliged to Call.

2. In a prosecution for homicide, where the only eye-witness was a brother of the defendant, and an accomplice though not jointly charged, whose name had been indorsed on the information, refusal to grant a motion to require the state to place such witness upon the stand, *held* not error, the court being advised by the county attorney that, if called, the witness would by false swearing and the concealment of material facts injure the state's case.

*Appeal from District Court, Fallon County, in the Sixteenth Judicial District; B. B. Law, Judge of the Ninth District presiding.*

WALTER VANDERVOORT was convicted of murder in the second degree, and from the judgment and an order denying his motion for a new trial he appeals. Affirmed.

*Messrs. Loud & Leavitt* and *Mr. Joseph Hodgson,* for Appellant, submitted a brief; *Mr. C. H. Loud* argued the cause orally.

*Mr. S. C. Ford,* Attorney General, and *Mr. Otto A. Gerth,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Gerth* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Appellant was convicted, in Fallon county, of the crime of murder in the second degree. He appeals from the judgment

imposed and from the court's order denying his motion for a new trial.

In the year 1917 appellant was jointly interested with his [1] brother, Worden Vandervoort, in ranching operations near Westmore; he contracted with one George Davis to put up certain hay, owned by appellant alone, for which service Davis was to receive one-third of the hay in the stack. Appellant, in the absence of Davis, hauled what he claimed to be his two-thirds; Davis claimed that a considerable portion of his hay had been taken, and, after making a demand on appellant, placed the matter in the hands of Charles J. Dousman, then county attorney of Fallon county, who wrote appellant concerning the matter. It appears from the evidence that the brothers took offense at this action. Prior to that time the three had been on good terms, and Davis had purchased a wagon and mower from Worden Vandervoort for the sum of $80, but had not paid the purchase price.

On the trial four witnesses testified to threats made by appellant against Davis, to the effect that he would "get" or "fix" Davis, each threat being accompanied by vile epithets, and, according to witnesses for the state, on the morning of December 5, Worden Vandervoort told his brother, this appellant, that, "after you get back from getting some coal and I get back from Wilson's we will go and settle with 'Slim,'" Slim being a nickname for Davis. On that date the brothers did go to the Shaw ranch, where Davis was living alone, but when they arrived a man by the name of Pitson was with Davis, and, though Davis invited them to stay to dinner, they remained but a few moments and went to the Arnsworthy ranch, a half mile distant, from which the Shaw house could be readily seen. Here they took dinner with Arnsworthy, who noticed that Walter Vandervoort was armed with a 38-caliber revolver, and who, on request, was permitted to examine it, and noted that it contained six cartridges. The brothers discussed certain business matters with Arnsworthy and watched the Shaw house from the window; they noted the departure of Pitson,

and shortly thereafter returned to the Shaw ranch. What transpired there could only be learned from the two Vandervoort brothers, and was developed at the trial by the state from various statements made by them.

Appellant appeared at A. C. Long's store, and telephoned for a doctor, and on being questioned said he had shot Davis, and, according to Long, told about where Davis was shot, on the ranch, outside the house, and in answer to the question as to how badly he was hurt stated that he was able to walk to the house. Later appellant gave himself up to the sheriff, stating, "I shot George Davis," and gave the sheriff the revolver, which then contained five unexploded cartridges and one empty shell. Davis had been shot in the breast, the ball passing through his body, and died that night. The doctor testified that his death was caused by the gunshot wound.

Worden Vandervoort related his version of the affair to the doctor in the presence of Davis, and while Davis was still conscious, and the only remark made by Davis was, "Tell the rest of it," or "Tell it all," whereupon the doctor advised him to keep quiet. Worden's story is that the trip was made primarily to see Arnsworthy; that they stopped at the Shaw ranch, and were told by Davis that Arnsworthy had that morning told him that he (Arnsworthy) was going to a neighbor's shortly, and that their hurried departure was for the purpose of seeing Arnsworthy before he left his ranch. As to this, Pitson denied that Davis had made such a statement, and Arnsworthy testified that he had told Davis nothing of the kind. According to Worden Vandervoort, on returning to the Shaw ranch, he knocked and was invited to enter; that they went in and had some conversation with Davis, and he then showed him the Dousman letter, and asked what it meant; that Davis said they had taken or stolen enough of his hay to settle the other account, and thereupon arose and attempted to strike Worden, who caught him about the neck and got hold of his thumb. Davis was much smaller than, and not a match physically for, either of the Vandervoort brothers. It seems he had a sore

thumb and, when seized by Worden, cried out in pain and promised, if released, to "settle like a man," whereupon he was released. On being released, according to Worden's story, Davis asked to be excused, went first to the barn and got his horse and then to the granary and secured a gun, and, coming toward the house, ordered the brothers to come out, using a vile epithet. On their refusal, he fired a charge of shot through the door at about the height of a man's head, the charge striking the opposite wall. Shortly after he entered the kitchen with the gun held in position to fire. The brothers had retreated to an adjoining room and stood behind a post. As Davis advanced, Walter Vandervoort, who stood behind Worden, fired, and Davis fell.

The state's witnesses testified to the shot having been fired through the door, and that the shotgun was in the room with an exploded shell in the right barrel and a loaded shell in the left, but that the gun had been broken and out of order for some time and the left barrel could not be discharged. Two loaded shells were found on the kitchen floor.

The prosecution having announced that it was about to rest its case, the defense demanded that the prosecution be required to call Worden Vandervoort, he being the only eye-witness to the transaction and his name being indorsed on the information as a witness for the state. Thereupon the county attorney offered to make an affidavit setting forth his reasons for not so doing, but was advised by the court that his statement would be sufficient, and he then stated as his reasons that, to the best of his knowledge, the statement of Worden Vandervoort would not be correct and truthful; that many facts were in his possession which induced him to believe that the witness was biased, and that the demands of justice dictated that, if the witness be examined at all, the state should have the opportunity to cross-examine him at length, and should not be deprived of the right of impeachment. On this showing the court denied the motion and the state closed its case.

Worden Vandervoort was called as a witness for the defense, and told substantially the same story as he had related to the doctor and at the inquest. On rebuttal, the state called three witnesses, who testified to a conversation in which Worden stated, some time prior to the killing, that he was going "fifty-fifty" with Walter, and that if Davis licked one he would have to lick both, one witness who testified that Worden had stated to him that, "If Davis does not settle with me, I'll get him," and one who testified that the day before the killing Worden said that he was going up to settle with Davis, and that he was not going unarmed.

Arnsworthy, recalled, testified that after the shooting, Worden came to his ranch and told him of it, and stated, "I am proud of the —— —— —— where he lays."

But two assignments of error are made:

(1) Denying the defendant's motion to direct the county attorney to place Worden Vandervoort on the stand, he being the only eye-witness to the shooting.

(2) Insufficiency of the evidence to prove beyond a reasonable doubt (a) that defendant is guilty of the crime of murder as charged in the information, or of any other crime embraced therein, or (b) that defendant is guilty of murder in the second degree.

1. Under the old English common law, the prosecution was [2] compelled to place all eye-witnesses on the stand. Originally the rule applied in all felony cases, but was later restricted to homicide cases. (1 Chitty Crim. Law, 624.) "Under the rigorous and harsh rules of the old common law, there was reason for compelling the prosecution to call and examine as witnesses all persons who had knowledge of material facts connected with the crime charged against an accused person. That law denied him counsel, and sealed his lips as a witness." (*Keller* v. *State*, 123 Ind. 110, 18 Am. St. Rep. 318, 23 N. E. 1138.) "The prisoner was not permitted to call witnesses, although present, and the issue of his guilt or innocence was determined upon the evidence offered in support of the prose-

cution. Subsequently, when he was permitted to have wit-
nesses, they did not obtain any particular credit by reason of
the fact that they were not sworn, and the practice continued;
but later, when the prisoner's witnesses were permitted to tes-
tify on oath and he was permitted to call on his own behalf all
eye-witnesses of the crime, the reason for the ancient rule
ceased." (1 Chitty Crim. Law, 624, 625.) "Under the later
and present practice, however, the prosecution need not ex-
amine all its witnesses, but the choice, introduction and ex-
amination of the state's witnesses usually rests in the discretion
of the prosecuting attorney." (16 Corpus Juris, 845, and note.)
And in this state the statute specifically so declares: "Upon a
trial for murder or manslaughter it is not necessary for the
state to call as witnesses all persons who are shown to have been
present at the homicide, but the court may require all of such
witnesses to be sworn and examined." (Sec. 9283, Rev.
Codes.)

The wording of the statute is such, however, that, while it
may not be necessary to call *all* witnesses, the state is not
excused from calling at least one witness, or the only witness
to a homicide, unless there is an exception to the general rule
laid down in the case of *State* v. *Metcalf*, 17 Mont. 417, 43 Pac.
182.

Questions concerning the calling of "all witnesses" have
been raised in this state in a number of cases, although the
question here involved has not been before the court. The case
of *Territory* v. *Hanna*, 5 Mont. 248, 5 Pac. 252, was decided
before the passage of the statute referred to. There, the
county attorney, having stated that the wife of deceased was
present in an adjoining room when the homicide was committed;
the court said: "The prosecuting attorney ought to have called
this witness, or made some satisfactory explanation to the
court why he did not, otherwise a suggestion is raised that
there was design and purpose in omitting to call the witness.
Especially should she have been called, as there was no proof

57 Mont.—35

of the circumstances attending the killing in evidence at the time the motion was made.''

In the case of *State* v. *Rolla,* 21 Mont. 582, 55 Pac. 523, the court, commenting on the *Hanna Case,* said: ''If the prosecuting attorney in the case quoted from had made some satisfactory explanation of his refusal to place the eye-witness on the stand, it might have altered the case very materially.''

In the case of *State* v. *Tighe,* 27 Mont. 327, 71 Pac. 3, the court said: ''It is discretionary with the trial court whether all persons who are shown to have been present at a homicide shall be sworn and examined in behalf of the state. Exercise of its discretion will be corrected only in case of abuse'' (citing *State* v. *Rolla, supra*). And a like ruling was made in *State* v. *Inich,* 55 Mont. 1, 173 Pac. 230.

The case relied upon by counsel for the appellant, however, is that of *State* v. *Metcalf,* above, where the demand was made that the state call and examine the only person shown to have been present at the homicide, and available at the trial. The county attorney stated that this witness was too drunk at the time to have seen anything that occurred, and the trial court denied the motion. This court held that the reason given was not sufficient to warrant the refusal, but that the witness should have been placed on the stand and examined, that the jury might determine the fact. The court quoted from the opinion in *Wellar* v. *People,* 30 Mich. 16, as follows: ''In cases of homicide, and in others where analogous reasons exist, those witnesses who were present at the transaction, or who can give direct evidence on any material branch of it, should always be called, unless possibly, where too numerous''—and then said: ''We think, under the great weight of authority, that resort should not be had to circumstantial evidence in such cases where it appears that direct proof can be reasonably had.'' This is a salutary rule for the safeguarding of the rights, the life and the liberty of the accused, and should be adhered to in all cases where ''direct proof can be reasonably had.'' However, to every rule there are exceptions, which are

as necessary of observance as are the rules themselves, and should be invoked whenever justice and public safety and the protection of the interests of society require it. And "when the reason of a rule ceases, so should the rule itself." (Rev. Codes, sec. 6178.)

The reason for the rule in the *Metcalf Case* is that all of the facts be brought to the attention of the jury so that full justice might be done; that the innocent be protected; but the rule was never intended as a shield against the eliciting of all of the facts and circumstances. Here, the witness was produced in the courtroom; the defense could and did make him its own witness, and get before the jury all the facts within his knowledge. The state had laid before the jury all the facts it could have proven by the witness, and the only result of granting the motion would have been to require the state to vouch for the witness and to exclude from consideration by the jury those damaging statements by the witness elicited on rebuttal.

The theory of the prosecution was, throughout the trial, that the evidence tended to show a conspiracy between the Vandervoort brothers to do away with the deceased, and the consummation of that conspiracy. The county attorney did not believe, from the facts in his possession, that "direct proof could be reasonably had" from this sole eye-witness, but that, on the contrary, he would pervert the facts to establish the innocence of the accused—that the witness was in fact an accomplice of the defendant on trial, and the evidence tended to show that this belief was well founded. It would seem a perversion of justice to require the prosecution, under such circumstances, to place the witness on the stand and vouch for him, and the weight of authority is against such a requirement.

In the case of *State* v. *Barrett*, 33 Or. 194, 54 Pac. 807, the court, after stating the English rule, says: "And in this country it is the rule, in Michigan and Montana, that the prosecuting officer is bound to show the *res gestae*, or entire transaction, by calling all the obtainable witnesses present at the time, unless

it appears that the testimony of those not called would be merely cumulative [citing Michigan cases and *State* v. *Metcalf, supra*]. But this doctrine is denied and repudiated, and we think rightfully, by a great majority of the courts in which the question has come up for adjudication. [Citing a large number of authorities.] It probably came into use in England at a time when the right of a defendant in a criminal case to be represented by counsel, or to have witnesses appear and testify in his behalf, was either denied entirely, or very much abridged. Under such circumstances, it was, of course, important that the prosecution be compelled to prove the entire transaction, and to call all the witnesses present at the time, whether they would testify for or against the defendant. But these restrictions upon the rights of a defendant do not, and never did, exist in this country. * * * In addition to this, the state is bound to make out its case beyond a reasonable doubt; and, if the prosecuting officer does not call sufficient witnesses for that purpose, or if any unfavorable inference can be drawn from his failure to call any witness, the defendant is not likely to suffer by the omission. And if he calls only such witnesses as are favorable to the state, the defendant has a right to call any others which he may suppose will relate the facts favorable to him. It does not seem to us, therefore, that the state should be compelled to call and vouch for a witness, even though it be evident that he knows all about the facts, when the prosecuting officer, acting in good faith and under his official oath, is of the opinion that he will, by false swearing, or by the concealment of material facts, attempt to establish the innocence of the accused."

In the case of *Ross* v. *State*, 8 Wyo. 351, 57 Pac. 924, the court, following the Oregon court, said: "The courts of Michigan and Montana adhere to the former English rule, except when the witnesses are too numerous * * * [citing several Michigan cases and the case of *State* v. *Metcalf, supra*]. In the great majority of the states where the question has been passed upon, however, the decisions are the other way [citing

cases]." The court thereupon followed the latter rule. It then remarks: "As the state does not desire the conviction of any innocent person, we have no doubt of the power of the court, and it might become its duty, in case of any attempt of the prosecuting officer to prejudice the defendant by the suppression of testimony, to call, or require the prosecutor to call, the witnesses. But no such condition exists in this case."

In 12 Cyc. 550, we find the declaration that "even where the practice is to require the prosecution to produce all the witnesses, the state cannot be required to call the accomplice of the defendant as a witness."

The foregoing cases, we believe, place too narrow a construction on the *Metcalf Case,* which, we apprehend, goes no further than to lay down the general rule that the case should not be made by circumstantial evidence in homicide cases "where direct proof can be reasonably had." If the evidence tends to show that the witness will, by false swearing or by concealment of facts, seek to establish the innocence of the accused, it cannot be said that "direct proof can be reasonably had" from such a witness, and it is here we believe an exception to the general rule heretofore laid down should be had.

Thus, in *Goode* v. *State,* 57 Tex. Cr. 220, 123 S. W. 597, where the facts are singularly similar to those in the case at bar, the state made its case by circumstantial evidence and the statements and alleged confessions of the defendant, who told of the killing and of the presence of one Joe Dorsey. Dorsey was under arrest and in jail; the demand was made that the state place him on the stand. In passing on the court's refusal to grant the demand, the Texas court said: "This motion alleges that Dorsey was an eye-witness to the killing, and the testimony of the state indicated clearly that he was a party to the criminal conspiracy to kill deceased. The motion itself showed he was in jail, and it would indeed have been a singular rule to require the state to place upon the witness-stand a co-conspirator to be bound by his testimony."

In the case of *People* v. *Rush,* 107 Mich. 251, 65 N. W. 99, the court employed the following language in disposing of this question: "The first alleged error is that the court did not require the people to produce a witness whose name was indorsed upon the information. There are two complete answers to this: (1) The witness was in court, and was called as a witness by the respondent, who had the benefit of his testimony. (2) His name was placed upon the information at the request of the respondent. The testimony of the people disclosed that another man was with the respondent at the time of the assault. The contention is that this witness was that man; that he was an eye-witness to the transaction; and that it was therefore the duty of the prosecutor to call him, under the following decisions: [citing Michigan cases]. The assault was premeditated; was made in the night, with some blunt instrument; and, as soon as the cowardly blow was struck, the respondent and his companion ran away, and escaped in the darkness. The above decisions do not hold, nor is there any reason or common sense in holding, that the people should call as a witness an accomplice in crime." True, this last case was not a homicide case, but one for assault with a deadly weapon; but the court made no distinction, and the cases referred to were largely homicide cases. The closing statement of the quotation voices the sentiment of the writer on this subject.

Here we have under consideration a case where there were but two men present at the time of the shooting, the man charged with the crime and his brother, who might well have been placed on trial with him. On the trial the state made a complete case from circumstantial evidence, including the statement of both of these men as to what took place at the time of the shooting; the state could not hope to elicit any fact from the witness Worden Vandervoort that would aid the state, but, had he been placed on the stand, would have vouched for him, and have been precluded from impeaching him or showing motive on his part, and would only have aided the defendant in the action to prove matters claimed to be the facts by the Van-

dervoort brothers, tending to show justification; the witness was produced in court, and the defendant placed him on the stand and had the advantage of his testimony. Under such circumstances, we are of the opinion that, to the general rule laid down in the *Metcalf Case*, there is the exception that, where the evidence reasonably tends to show that the proposed witness was an accomplice in crime, whether charged jointly or not, and that, if called, he would by false swearing or the concealment of material facts, injure the state's case, and such a showing is made to the satisfaction of the court, the state is not bound to call such a witness; though the prosecution should have him present and available to the defense, that they be not misled by the fact that the name of such witness was indorsed on the information. We find no error in the court's refusal to grant the motion.

2. The second assignment of error is that the evidence is insufficient to justify a verdict of murder in the second degree, or any verdict against appellant. The evidence has been sufficiently canvassed to disclose the facts, which are ample, if believed by the jury, to justify the verdict rendered.

The judgment and order denying a new trial are affirmed.

*Affirmed.*

ASSOCIATE JUSTICES HOLLOWAY, HURLY and COOPER concur.

MR. CHIEF JUSTICE BRANTLY, being absent, takes no part in the foregoing decision.