STATE, RESPONDENT, v. SHAFER, APPELLANT.

(No. 1,552.)

(Submitted October 1, 1901. Decided October 28, 1901.)

*Criminal Law—Homicide—Information—Motion for Leave to File—Verification—Warrant—Evidence—Res Gestae—Evidence Tending to Establish Another and Distinct Offense—Motive—Instructions—Degrees of Murder.*

1.    Under Constitution, Art. III, Sec. 7, and the provisions of the Penal Code of 1895, a warrant may issue on an information filed by the county attor-

ney by leave of court on a motion in writing not verified, and the information verified only on information and belief.

2. In a trial for homicide occurring in a saloon a few hours after a conflict between defendant and deceased at another place, evidence of such conflict was admissible to show motive, though not part of the *res gestae* and incidentally tending directly to establish against the defendant another and distinct offense,—where the cause and details are excluded, and the court expressly confines the jury in their consideration of such evidence to the question whether it showed malice in the defendant at the time of the homicide.

3. Where the evidence would warrant a verdict of guilty of any grade of unlawful homicide or of acquittal, it is error for the court to give to the jury simply the statutory definitions of murder, murder of the first and second degrees, of manslaughter, and of justifiable homicede, without any further declaration of the distinction between murder of the first and second degrees than is contained in the statute.

*Appeal from District Court, Silver Bow County; William Clancy, Judge.*

JOSEPH SHAFER was convicted of murder in the first degree, and from the judgment and from an order denying a new trial he appeals. Reversed.

*Mr. E. S. Booth,* for Appellant.

*Mr. James Donovan, Attorney General,* for the State.

The court instructed the jury, defining murder in the first and second degree, in the language of the statute. Is such definition of murder in second degree in language of statute sufficient? Appellant maintains this is insufficient, citing *State* v. *Baker,* 13 Mont. 161, and cases cited therein. That it is sufficient, see *People* v. *Chaves,* 122 Cal. 141. The *Baker Case, supra,* rests upon the case of *State* v. *Meyer,* 58 Vt. 457, and and an examination of that case and of the laws of Vermont will disclose the fact that in Vermont there was no statute defining murder. An examination will show further that the trial judge in the case of *State* v. *Meyer,* on page 464, in explaining to the jury what constituted murder, said: "We have to resort to the common law to ascertain the definition of murder, and that defines it to be the unlawful killing, with malice aforethought, of any human being. * * * The act of killing

must be intentional; * * * there must be premeditation; * * * there must be evidence that he meditated the act before the act was done; that is what is required to constitute the crime of murder, in my judgment." On page 467 of the same opinion the court says: "As an abstract proposition, the charge of the presiding judge, explaining simply what constituted murder at common law, is unexceptionable; but as applicable to this case, under our statute, creating two degrees of murder, it was erroneous." It was erroneous because it made premeditation an element of murder in the second as well as in the first degree, when as the court said in the same opinion (p. 466), "the distinguishing feature of the two degrees rests in the absence of deliberation, premeditation and preconcerted design from the second degree." Hence, when the court, in *State* v. *Meyer, supra,* gave the statutory definition of murder in the first degree, and then followed with the statutory language that "all other kinds of murder shall be murder of the second degree," no distinction was marked, because the distinction made by the statute itself was destroyed by the other instruction of the court which made premeditation an element of both degrees of murder. Such conditions do not exist in the present case, and it is clearly distinguished from the case of *State* v. *Meyer, supra.* I am not unmindful of the language of the *Meyer Case* quoted in the *Baker Case, supra,* but I do say that the language quoted is entirely due to the original mistake of the trial judge in defining murder. There is not a case cited in the *Meyer Case, supra,* to support it. It rests upon the self-evident contradictions of the trial court.

The other cases cited in the *Baker Case, supra,* do not support it, simply holding that the instructions should cover such questions as are made applicable by the evidence. The court instructed the jury as to murder, malice, murder in the first and second degrees, and the punishment for each; manslaughter and its punishment; justifiable and excusable homicide in the language of the Code, and that "whenever a crime is divided into degrees, the jury, if they convict the defendant, must find

the degree of the crime of which he is guilty." The court also instructed the jury with care as to what elements must accompany the murder to make it murder in the first degree.

In the *Baker Case, supra,* the court says: "The question for this court to determine is, whether this was a sufficient definition of murder in the second degree (being in language of statute), to enable the jury to determine the essential characteristic of the degree of homicide." Testing this question by the instructions given in this case, we are firmly convinced that the requirements have been complied with. First, the court instructed that "murder is the unlawful killing of a human being with malice aforethought. Second, that to constitute murder in the first degree, it must be deliberate and premeditated. Third, "All other kinds of murder are of the second degree," meaning, of course, all kinds of murder except that accompanied by deliberation and premeditation. Construing the instructions together, it is impossible to draw any conclusion from them other than that the words "All other kinds of murder are of the second degree," means the unlawful killing of a human being with malice. The definition of murder in the second degree in this state is simply the Code definition of murder. (*State* v. *Calder,* 23 Mont. 504, 521; *State* v. *Fisher,* 23 Mont. 540, 546.) From the fact that the crime is presumed to be murder in the second degree "when the state has proved the killing by the defendant without evidence tending to show that the act amounts to manslaughter, or that the defendant is jusifiable or excusable" (*State* v. *Fisher, supra*), it must follow that murder in the second degree is simply the unlawful killing with malice, otherwise there could be no such presumption, and if that presumption is correct, then the court did fully instruct as to murder in the second degree when it instructed as to murder.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Upon a second trial, granted to the defendant by the district court in obedience to the mandate of this court (*State* v. *Shafer,*

22 Mont. 17, 55 Pac. 526), he was again convicted of murder of the first degree and condemned to death. This appeal is from the judgment and an order denying a new trial.

1. The charge against the defendant was by information filed by the county attorney by leave of court upon a motion in writing not verified. The information was verified by the county attorney upon his information and belief. Prior to the filing of the formal charge there had been no preliminary examination by a justice of the peace founded upon a complaint or affidavit reduced to writing and showing probable cause, supported by oath or affirmation of any person. The motion for leave in the district court was accompanied by a statement in writing, but this was not supported by oath or affirmation. The defendant was arrested and brought into court under a bench warrant issued after the information was filed. He thereupon moved the court to set aside the information on the ground that he had been arrested and held to answer the charge preferred against him in violation of Section 7 of Article III of the Constitution of the state, which prohibits the issuance of any warrant to seize any person without probable cause, reduced to writing, and supported by oath or affirmation. The motion was overruled, and, upon arraignment the defendant standing mute, a plea of not guilty was ordered entered by the court. Thereafter the cause was tried, resulting in a judgment of conviction.

The contention of the defendant now made for the first time in this case is that, under the constitutional provision referred to, the written charge by the county attorney, verified upon his information and belief only, and not supported by an affidavit by himself or some other person setting forth facts sufficient to show probable cause, did not authorize the issuance of the warrant, his arrest, and subsequent trial.

The sections of the statute regulating the filing of informations upon leave granted by court (Penal Code, Secs. 1383-1387, 1810, *et seq.*), and prescribing the necessary steps to be taken, require a written motion for such leave, but nowhere provide that it must be supported by oath or affirmation. Under

the statute of 1891 (Session Laws of 1891, p. 249, Sec. 3), the county attorney was required to verify the information, but Mr. Justice Hunt, in commenting upon this requirement in *State* v. *McCaffery,* 16 Mont. 33, 40 Pac. 63, points out that the words "probable cause," as used in the constitution, are properly construed to embrace facts embodied in a complaint or information charging an offense upon information and belief. We believe this to be the true construction, both upon principle and for sound reasons of public policy. Where a charge is preferred by indictment in this state, it is usually based upon the information and belief of a grand jury of seven men. If the grand jury were required to act upon personal knowledge of the crimes for which they present indictments, it would rarely be the case that a charge could be preferred, no matter how much information they might obtain from witnesses, nor how thoroughly well founded their belief in the truth of it and the guilt of the person accused. So it is with the county attorney or other public officer in endeavoring to bring wrongdoers to punishment. In the nature of things, these officers can rarely have personal knowledge of the facts and circumstances of a crime; and, in case of their inability to secure the affidavit of some one possessed of such knowledge upon which to prefer a charge, the lawbreaker would go unpunished. The provisions of the Code touching informations merely require that they shall be subscribed by the county attorney. It is nowhere made his duty to attach his verification, or to support the formal charge by an affidavit either by himself or any other person. It was held by this court in *State* v. *Clancy,* 20 Mont. 498, 52 Pac. 267, that the provision of the constitution here invoked is not violated by an omission on the part of the legislature to require an information to be verified, but that it is satisfied when an information, properly subscribed, is filed by the county attorney, because in thus presenting a formal charge this officer acts under his official oath. After a careful re-examination of the authorities cited and the provisions of the statute pertinent to the subject, we are satisfied with the conclusions reached in *State* v. *Clancy,*

*supra;* and it necessarily follows that the written motion made by the county attorney for leave to file the information need not be supported by oath or affirmation, nor is it required that it should set forth with technical accuracy the facts constituting a formal charge.

2.  The facts leading up to and attending the homicide are, briefly stated, the following:  On the evening of August 11, 1897, the deceased, Hawkins, and the defendant, with some of their friends, had attended a dance at the Columbia Gardens, a resort near Butte, in Silver Bow county, remaining there until the following morning.  About 2 o'clock in the morning Hawkins and the defendant had a personal encounter, during which Hawkins struck the defendant.  The latter thereupon drew his pistol and fired twice at Hawkins, but without effect. Mutual friends interfered and stopped the conflict, and shortly thereafter Hawkins and the defendant, with their friends, returned to Butte.  The defendant, with some of his party, went to the Swim Saloon, arriving there between 5 and 6 o'clock.  The bar in the saloon forms a right angle with the line of the street, extending back from the front.  Upon entering the place the rest of the party began to drink, and were standing about the room in front of the bar.  The defendant apparently did not join in the drinking, but stood near and beyond the end of the bar towards the back of the room, some 18 feet from the entrance, leaning against a refrigerator.  He was facing the street entrance.  In a few minutes Hawkins entered alone.  From this point there is a conflict in the evidence as to what took place. Some of the witnesses stated that Hawkins advanced towards the bar as if to order a drink, and stopped near the front of the room, with his right arm resting on the bar and his left hanging at his side; that thereupon the defendant, having advanced within a foot or two of Hawkins, thrust the muzzle of his pistol against Hawkins and fired; that Hawkins caught the pistol and tried to wrest it from the defendant; and that there then followed a general fight between Hawkins on one side and the defendant and two or three of his friends on the other, which con-

tinued until Hawkins, having secured the pistol, broke away and ran into the street, where he was arrested by a policeman. Other witnesses stated that Hawkins upon entering the place held his right hand concealed in the pocket of his coat; that he proceeded to within a few feet of the defendant, who advanced to meet him; that thereupon Hawkins and the defendant clinched and began to fight; and that in a moment the shot was fired by the defendant, inflicting a wound in Hawkins' abdomen, from which, other evidence shows, he died on the following day. All the witnesses agree that in the general fight Hawkins was badly beaten and cut about the back of his head and neck, and that this was done by the friends of the defendant. No words were spoken by either Hawkins or defendant, except that, just as the encounter began, one or the other (it is not certain which) said, "What is the matter with you?" There is in the record evidence that some one told the defendant after he entered the saloon that Hawkins, since his return from the Columbia Gardens, had been trying to borrow a pistol, and had stated that he was "going to kill a nigger before morning." The defendant is a negro, as was also Hawkins. As a matter of fact, it subsequently appeared that Hawkins had no weapon when he entered the saloon. He was, however, a large, powerful man, and in this respect considerably superior to the defendant. What was the cause of the trouble at Columbia Gardens, the evidence does not disclose.

The defendant objected to all of the evidence tending to show the previous difficulty between himself and the deceased, on the ground that this occurrence was no part of the *res gestae,* and any inquiry concerning it was therefore immaterial. It is also argued by counsel that its admission by the court was prejudicial to the defendant, in that it tended to establish another and distinct offense. This evidence was offered by counsel for the state, and admitted by the court, as tending to show malice. What occurred there was certainly no part of the *res gestae* of the homicide. While it preceded the homicide, and may be said to have been, in a sense, one of the series of circumstances out

of which it may have grown, nevertheless each occurrence was complete in itself; and in the eye of the law the responsibility of the respective participants in each was to be judged by the positions they occupied at the different times, and the motives which prompted them. Who was in the wrong in the encounter at the Columbia Gardens was therefore not a proper inquiry for the jury in their endeavor to fix the responsibility for what occurred in the Swim Saloon. It was proper, however, for them to inquire what the motive or impulse was which prompted the defendant to fire the shot at the Swim Saloon; and, to enlighten and aid them in this inquiry, the condition of feeling theretofore existing between the defendant and the deceased was pertinent and material. In making this condition appear to the jury, the evidence admitted might incidentally bring to their knowledge facts tending directly to establish against the defendant another and distinct offense yet the possible effect of such evidence did not render it open to legal objection on the ground that it was incompetent or immaterial, and tended directly to prejudice the defendant in the eyes of the jury. (*State v. Geddes*, 22 Mont. 68, 55 Pac. 919.) A trial court should carefully guard against the admission of evidence tending to showing collateral matters, to the end that the real issue may not be obscured, and the defendant be thus prejudiced; at the same time the defendant may not be allowed to exclude from the consideration of the jury facts which are pertinent to the real issue on the ground that upon a previous occasion he had been guilty of another and distinct wrong. (*State v. Geddes, supra.*) The witnesses were not permitted to go into the details of the previous difficulty so as to make it appear who was in the wrong; and the court, as was proper, expressly confined the jury in their consideration of the evidence in this connection to the question whether it showed malice in the defendant at the time of the homicide. The ruling of the court was correct. (*People v. Kern*, 61 Cal. 244; *People v. Brown*, 76 Cal. 573, 18 Pac. 678; *People v. Thomson*, 92 Cal. 512, 28 Pac. 589; *People v. Colvin*, 118 Cal. 351, 50 Pac. 539.)

3. The court instructed the jury, in substance, that they were at liberty, according to their view of the evidence, giving to the defendant the benefit of every reasonable doubt, to find him guilty of either degree of murder or of manslaughter, or to acquit him entirely if upon the whole case they entertained a reasonable doubt whether he killed the deceased in necessary self-defense. Murder was properly defined in the words of the statute. Then followed the statutory definitions of murder of the first and second degrees, of manslaughter, and of justifiable homicide; no attempt being made, however, to draw a distinction between murder of the first and second degrees. The jury were left to draw this distinction for themselves from the general definitions given, and the words, "all other kinds of murder are of the second degree," following the definition of murder of the first degree. Counsel contend that this was prejudicial error. The identical question here presented was discussed by this court in *State* v. *Baker,* 13 Mont. 160, 32 Pac. 647, and decided in favor of the contention now made. The court in the present case correctly told the jury that the facts presented in evidence would warrant a verdict of guilty of any grade of unlawful homicide or of acquittal. If the statements of some of the witnesses were to be taken as true, the shooting of the deceased was without any palliating circumstances whatever, and the result of a deliberate design on the part of the defendant to gratify his feelings of malice and revenge. On the other hand, there was evidence from which the inference was permissible that it was the result of passion rekindled by the sudden and unexpected appearance of the deceased while the defendant was still smarting from the recollection of the recent encounter at Columbia Gardens. Under this view the jury might have concluded that the defendant was prompted by preconceived malice and ill will, but that there was wanting the deliberate purpose to take life necessary to constitute murder of the first degree. Again, the view might have been taken that the killing was the result of a sudden heat of passion brought about by a renewal of the trouble by the deceased himself; some of the

witnesses having testified that upon entering the saloon the deceased advanced towards the defendant and renewed the fight. A finding of these facts would have justified a verdict of manslaughter. Again, there was evidence tending to show that the deceased had made a threat against defendant's life, that he had endeavored to procure a pistol, that these facts had been communicated to the defendant, and that the deceased, upon entering the saloon in sight of defendant, had his right hand concealed in his pocket, and in this attitude had advanced upon the defendant with the apparent purpose of carrying his threat into execution. These facts, if found by the jury, would have justified an acquittal. It is the duty of the trial court to so declare the law applicable to every phase of the case that the jury may consider the evidence with the full knowledge of every essential element of each grade of crime of which the defendant may be convicted. (*State* v. *Baker, supra.*) Jurors are not learned in the law. Ordinarily they have not experience and knowledge sufficient to enable them to draw nice distinctions necessary in the application of legal principles, and, unless the court comes to their assistance and declares these distinctions so that they may understand and apply them, they are left to grope in confusion and uncertainty. Under such conditions a verdict is ignorant guesswork, and not the result of intelligent deliberation. The court nowhere told the jury that murder of the second degree is the unlawful killing of a human being with malice aforethought, but without deliberation. Thus the jurors were left to find out for themselves, from a reading of the statute, and by a process of exclusion, that deliberation is the distinguishing characteristic of murder of the first degree, and that all other kinds of murder are of the second degree, because this element is wanting. Upon further consideration of the subject, we are satisfied that the rule laid down in *State* v. *Baker, supra,* is correct.

Let the judgment and order be reversed, and the cause be remanded for a new trial.

*Reversed and remanded.*