STATE, RESPONDENT, v. HUM QUOCK, APPELLANT.

(No. 6,757.)

(Submitted March 10, 1931. Decided April 29, 1931.)

[300 Pac. 220.]

504

Mr. James H. Baldwin and Mr. Thomas J. Walker, for Appellant, submitted a brief; Mr. Walker argued the cause orally.

*Mr. L. A. Foot*, Attorney General, and *Mr. S. R. Foot*, Assistant Attorney General, for the State, submitted a brief; the latter argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

Hum Quock has appealed from a judgment convicting him of possessing morphine hydrochloride, a felony, and from an order denying his motion for a new trial.

The only question presented is whether the district court erred in refusing to suppress evidence used upon the trial. Timely motion was made.

The case turns upon the legality of defendant's arrest. If the arrest was lawful the search disclosing the narcotics was lawful, otherwise the search was unlawful and the narcotics should not have been admitted in evidence. Where an arrest is made lawfully the person arresting may take from the possession of the arrestee any articles which may reasonably be of use on the trial. (*State ex rel. Neville* v. *Mullen*,

63 Mont. 50, 207 Pac. 634; *State ex rel. Kuhr* v. *District Court*, 82 Mont. 515, 268 Pac. 501.)

The arrest was made on February 22, 1930, by one Kelly without a warrant. Kelly was, and for over a year had been, a special investigator for the county attorney's office. He was not a peace officer, and it is conceded that the arrest was made by a private person, although Kelly was acting under the authority of the county attorney. (See *State ex rel. Sadler* v. *District Court*, 70 Mont. 378, 225 Pac. 1000.)

About two weeks before the arrest Kelly was informed by one who was addicted to the use of narcotics, but not a Chinaman, that defendant had been transporting "dope" (which to Kelly meant morphine or cocaine) from Butte to Billings about once a month. Defendant, said Kelly's informant, carried a grip or handbag somewhat like a suitcase. Sometimes he went to the depot in a taxi, and at other times he walked. Kelly had known defendant by sight for perhaps a year. Three or four days before the arrest Kelly received further information, this time from a Chinese whose identity, by consent of all, apparently, was not disclosed. Kelly had known this informant for three months and described him as a business man—"he has got certain business," said Kelly. The second informant told Kelly defendant would probably go to Billings in three or four days. On the morning of February 22, this Chinese business man told Kelly over the telephone, in effect, "that this certain Chinaman was going to the depot with a lot of dope." Upon examination by defendant's counsel as to what the Chinese business man said over the telephone, Kelly answered: "He said, 'Go to the depot on Front Street. A China boy take a load of dope to Billings, catch that nine o'clock train.'" Upon receipt of this communication Kelly went at once to the street designated, and at a point near the Northern Pacific depot observed defendant walking along the street slowly, carrying his handbag. Kelly drove his car close to the curb, stopped and stepped out in front of defendant, who dropped his handbag and called Kelly by name. Kelly arrested him, asking him what he had in his suitcase but was unable to understand his answer. Kelly then

opened the suitcase and pushing aside the wearing apparel observed a false bottom in the handbag, which, being lifted up, disclosed ten cans of morphine and five packages of cocaine. It is needless to say, perhaps, that prior to the arrest Kelly had no personal knowledge respecting the contents of the handbag. At the county attorney's office the county attorney and Kelly searched the handbag and also the defendant. Defendant was not taken before a magistrate, but was placed in jail. Three days later the county attorney lodged an information against him, charging him with the possession of morphine hydrochloride. The defendant through his counsel moved to suppress the evidence, which motion after a hearing before the district judge was denied. A bill of exceptions presented by defendant was settled and allowed.

Section 11751, Revised Codes 1921, provides: "An arrest is taking a person into custody in a case and in the manner authorized by law. An arrest may be made by a peace officer or by a private person." Under sections 11753 and 11754 a peace officer, and a private person, alike "may arrest another (1) for a public offense committed or attempted in his presence; (2) when the person arrested has committed a felony not in his presence; (3) when a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it." These statutes are founded upon common-law rules. Ordinarily they are not difficult of application, but the subject "Arrest without Warrant" has often been attended with great difficulty, especially when private persons have exercised that authority. (See Article by Professor Horace L. Wilgus in 22 Michigan Law Review, 673; *State* v. *Albright*, 144 Mo. 638, 46 S. W. 620; *Palmer* v. *Maine Central R. Co.*, 92 Me. 399, 69 Am. St. Rep. 513, 44 L. R. A. 673, 42 Atl. 800; Russell on Crimes, 7th ed., 727, and 9th ed., 799; 9 Halsbury's Laws of England, secs. 523, 607–617.)

"It has been sometimes contended, that an arrest of this character, without a warrant, was a violation of the great fundamental principles of our national and state constitutions, forbidding unreasonable searches and arrests, except by warrant founded upon a complaint made under oath. Those pro-

visions doubtless had another and different purpose, being in restraint of general warrants to make searches, and requiring warrants to issue only upon a complaint made under oath. They do not conflict with the authority of constables or other peace officers, or private persons under proper limitations, to arrest without warrant those who have committed felonies." (*Rohan* v. *Sawin*, 5 Cush. (Mass.) 281.)

The fear that in the process of administering the law some innocent man may be arrested is not new. In *Ledwith* v. *Catchpole*, E. 23 Geo. III, *Caldecott's Cases*, 291, quoted in *McCloughan* v. *Clayton*, Holt, 478, 483, 171 Eng. Rep. (Reprint) 311, 313, Lord Mansfield said: "The question is, whether a felony has been committed or not. And then the fundamental distinction is, that if a felony has actually been committed, a private person may arrest as well as a peace officer; if not, the question always turns upon this—was the arrest bona fide; was the act done fairly, and in the pursuit of an offender, or by design or malice and ill will. Many an innocent man has been, and may be, taken up upon suspicion; but the mischief and inconvenience to the public in this point of view are comparatively nothing." In other words, the security of organized society is not to be sacrificed because in the course of the enforcement of the law an innocent man may occasionally be arrested, if the person arresting acts upon probable cause. It is not to be expected that an innocent man will not be arrested occasionally under any system. Groundless fear that the rights of an innocent person may be impinged has aided many a guilty man to escape. In addition to the safeguards provided to avoid such mistake, the person arresting is liable in damages, and false imprisonment is punishable civilly and criminally.

Hum Quock, at the time of his arrest, had committed, and was then engaged in committing, a felony. Either an officer or a private person with actual knowledge of the fact had the authority to arrest him without a warrant, and either having reasonable cause for believing that he had committed and was continuing to commit a felony had authority thus to

arrest him. Kelly did not have actual knowledge of the fact. Did he have reasonable cause to believe defendant was transporting morphine or cocaine?

In *State ex rel. Neville* v. *Mullen,* supra, this court, speaking through Mr. Justice Holloway, said: "Whatever else may be said upon that subject, the utmost that can be exacted of the officer who arrests without a warrant is that the circumstances shall be such that upon them alone he would be justified in making a complaint upon which a warrant might issue. In other words, if the circumstances are such that the officer could properly secure a warrant of arrest, he may arrest without a warrant if the offense which the circumstances tend to establish was committed in his presence; and it is settled in this jurisdiction that the officer need not have actual, personal knowledge of the facts which constitute the offense in order to be able to make complaint and secure a warrant. The question was settled in *State* v. *McCaffery,* 16 Mont. 33, 40 Pac. 63, wherein the court said: 'It seems to us that the proper construction of the words "probable cause" as used in the Constitution may be facts embodied in a complaint which charges the offense upon information and belief.' The doctrine of that case was expressly approved in *State* v. *Shafer,* 26 Mont. 11, 66 Pac. 463." Mr. Chief Justice Brantly, concurring specially, denounced a rule which would authorize an officer to arrest upon a bare suspicion, not supported by the actual existence of facts and circumstances which in the mind of a reasonable person point to the commission of an offense. He then went on to say: "On the other hand, the announcement of a rule which would deny the right to make an arrest in all cases except upon personal knowledge of the officer, would render it well nigh impossible to enforce the prohibition, the anti-gambling and other similar laws enacted to suppress crimes which from their nature are generally committed in secret. It is not understood that anything said by Mr. Justice Holloway is contrary to my view. No rule can be laid down applicable to all cases. The arrest or seizure must be justified by the circumstances disclosed by the facts in each case."

Now, further as to probable cause. In *State* v. *Gardner*, 74 Mont. 377, 240 Pac. 984, Mr. Justice Holloway, speaking for the court, said: "The term 'probable cause,' like the term 'reasonable doubt,' is exceedingly difficult to define with any degree of precision. As a reasonable doubt signifies a doubt founded on reason, so probable cause means cause which is probable. The word 'probable' means 'having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt.' (Webster's International Dictionary.)"

"Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." (*Burt* v. *Smith*, 181 N. Y. 1, 2 Ann. Cas. 576, 73 N. E. 495; *State ex rel. Sadler* v. *District Court*, supra.)

"In the majority of decisions probable cause is defined in substance but with some verbal differences, as reasonable grounds for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the accused is guilty of the offense with which he is charged." (38 C. J. 403; *Cornner* v. *Hamilton*, 62 Mont. 239, 204 Pac. 489.) "If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient." (Chief Justice Taft in *Carroll* v. *United States*, 267 U. S. 132, 39 A. L. R. 790, 69 L. Ed. 543, 45 Sup. Ct. Rep. 280.)

"It is sufficient that the belief exists and that it is supported by facts and circumstances which reasonably warrant it. (*State ex rel. Neville* v. *Mullen*, 63 Mont. 50, 207 Pac. 634; *State ex rel. Merrell* v. *District Court*, 72 Mont. 77, 231 Pac. 1107.)" (*State* v. *Gardner*, supra.)

The facts which form the basis of probable cause are as variant as the numerous cases which come up for adjudication. (*Jenkins* v. *State*, (Tex. Crim. App.) 32 S. W. (2d) 848.) No two cases are exactly alike and each case must rest upon its

own facts. In determining whether probable cause has existed for an arrest, a liberal rather than a strict course should be followed. The essential constitutional guaranties must be preserved, but the law must not be so administered that while it adds no security to the law-abiding citizen it provides a shield for the lawbreaker, affording protection to the thief in the disposition of his spoils, and to the peddler of narcotics in possession and sale of his polluting drugs.

The narcotic crimes of necessity are carried on in the utmost secrecy. From what source ordinarily must information come? Obviously, from those who are in a position to know those who are engaged in the traffic and their methods of transacting their prohibited business. That Kelly was in possession, at the time of the arrest, of facts which would have justified him in swearing to a complaint charging defendant with the crime for which he was arrested, is not doubtful in our opinion. Kelly knew Hum Quock, and had been told that he had been transporting narcotics from Butte to Billings about once a month, and the manner of his going to the train was described. How much reliance Kelly placed in the information must be left to inference; Kelly says none of those addicted to drugs are reliable. But about ten days afterwards Kelly received from a Chinese business man, who, so far as Kelly knew, was not addicted to the drug, confirmatory information that defendant was expected to leave for Billings on one of his trips in three or four days. On the morning of February 22 the Chinese business man telephoned to Kelly that defendant was about to take the 9 o'clock train for Billings with a "load of dope." "Go the depot on Front Street," said the business man. Kelly immediately followed this direction, overtaking the defendant within eight minutes from the time he received word over the telephone. He observed defendant walking slowly along the street with a grip, which verified in a measure the information given him by his first informant. When Kelly brought his car to a stop and stepped to the street, the defendant dropped his handbag and mentioned Kelly's name.

It is argued that Kelly did not say that he placed reliance upon the information he received from the business man, but that he did rely upon that information cannot be questioned. This is an instance where actions speak at least as loud as words. It cannot be said that the actions of the defendant, at the time of the arrest, in dropping the handbag and mentioning Kelly's name are insignificant. (*State* v. *Grant*, 79 Mo. 113, 49 Am. Rep. 218.)

Under the circumstances there was need for speed. Defendant was about to take the train. It was a legal holiday when justices of the peace are not required to be at their offices. Furthermore, after seeing Kelly, would not the defendant have changed his plans?

It is true that the legality of the arrest cannot depend upon what is found in the arrestee's possession; nevertheless, it may have a bearing upon the bona fides of the belief of the person arresting. In other words, whilst the person arresting "at the time of the arrest does not know what he subsequently discovers, yet the fact that his belief is found to be correct accredits the belief, and gives weight to the evidence upon which he acted." (*United States* v. *Stafford*, 296 Fed. 702.)

When the facts are uncontroverted the existence of probable cause is a judicial question. (*Jenkins* v. *State*, supra.) If the facts are controverted and there is conflict in the testimony the presumption upon the controverted facts, as in the ordinary case, must be in favor of the finding of the trial judge, who observed the witnesses upon the stand. The appellate court is not bound by the finding of the trial court (*Michel* v. *Smith*, 188 Cal. 199, 205 Pac. 113), but where testimony has been received by the trial court, the appellate court will not overlook the fact that the trial court has had the benefit of seeing and hearing the witnesses on the stand.

The whole case considered, we have no reasonable doubt that the arrest was bona fide and that under the definitions of probable cause Kelly had reasonable cause for believing that the defendant was then conveying "dope" (morphine or cocaine) and therefore was actually engaged in the commission of a felony.

As a matter of fact, Hum Quock was doing just what Kelly believed he was doing. If an officer, sworn to do his duty, knowing what Kelly knew (and having no reason to doubt his information), had refrained from arresting defendant, the officer would have violated his duty. And the failure of officers to do their duty—closing the official eye to that which is visible enough to the ordinary man—has contributed largely to the failure of law enforcement, which is a subject of nation-wide comment.

Probable cause was held to exist under facts no stronger than are here presented, in *State ex rel. Merrell* v. *District Court*, supra; *State ex rel. Brown* v. *District Court*, 72 Mont. 213, 232 Pac. 201, and *State ex rel. Baracker* v. *District Court*, 75 Mont. 476, 244 Pac. 280.

The defendant's counsel rely upon *State ex rel. Sadler* v. *District Court*, supra, but in that case those making the arrest had no information whatever respecting the contents of the suitcase possessed by Sadler, nor any information which reasonably justified them in believing that he was then transporting intoxicating liquor. Their actions were based upon mere surmise. Cases from other jurisdictions where probable cause was held to exist under circumstances no stronger, if as strong, as those here, are: *People* v. *Bressler*, 223 Mich. 597, 194 N. W. 559; *People* v. *Ward*, 226 Mich. 45, 196 N. W. 971; *Jenkins* v. *State*, supra; *State* v. *Kittle*, 137 Wash. 173, 241 Pac. 962; *State* v. *Jenkins*, 195 N. C. 747, 143 S. E. 538; *State* v. *Bailey*, 320 Mo. 271, 8 S. W. (2d) 57. Many others might be cited.

It may be that Kelly made himself liable as for a false imprisonment of the defendant because he did not, as required by section 11764, Revised Codes 1921, without unnecessary delay take defendant before a magistrate or deliver him to a peace officer; but that is not material to this decision.

The judgment is affirmed.

Associate Justices Angstman and Matthews concur.

MR. JUSTICE GALEN and MR. JUSTICE FORD, Dissenting: We subscribe to the rule that a private person may

make an arrest without warrant when he has information, imparted to him by creditable persons, to cause him honestly and in good faith, acting with reasonable discretion and caution, to entertain the belief that a crime has been, or is being, committed,—that is, a private person may act when the facts and circumstances are such as to warrant a man of prudence and caution in believing a crime has been, or is being, committed. In our opinion, the testimony of Kelly falls short of this requirement. His testimony is unsatisfactory, to say the least, and does not carry conviction. He testified that two or three weeks before the arrest a drug addict advised him that defendant was carrying "dope" from Butte to Billings, making a trip "about once a month or so." He frankly admitted that his informant was unreliable. Clearly, this information was not sufficient to justify the arrest. But what about the so-called "business man," who is said to have supplied Kelly with information sufficient to justify the arrest? Upon this point Kelly testified that two or three days before the arrest a "yellow" man, whose name, by ruling of the court, he was not required to disclose, told him that "he thought this fellow was going to make that [Northern Pacific 9 o'clock] train around that time [Feb. 22]." He says this man was "a business man." "Q. Do you mean somebody, a druggist or what? A. Well, yes. Q. What kind of a druggist, in the drug business; do you mean that he was somebody engaged in the morphine and narcotic business? A. He is in business, different lines, got different kinds of business." It seems to us that the only reasonable inference to be drawn from this testimony is that this so-called "business man" was himself dealing in narcotics; at any rate, there is not one iota of evidence that he was a reliable or credible person. It is significant that it was not until his recross-examination by the county attorney that Kelly said anything about having received a telephone call from the "business man" on the morning of the arrest,— and not until his redirect examination by defendant's counsel that he divulged the language used by his informant. Had Kelly received a telephone call giving him the definite and explicit information he says he received, he would have disclosed

that fact on his direct or cross-examination. The conclusion is inevitable that the telephone call was an after-thought and conceived in Kelly's mind when he perceived the weakness of the showing he had made.

It is also significant that when Kelly first mentioned this alleged telephone call, it was from a *third* person, but after further questioning he changed his testimony and said it was the "business man" who called.

The majority opinion says that the "business man's" identity "was not disclosed, apparently by consent of all." We do not so read the record. Counsel for defendant pursued their inquiry in this regard until the court ruled that Kelly would not be required to divulge the name of his informant, and quite properly counsel made no further effort to obtain the name. We do not see how counsel could have done more.

We are forced to the conclusion that Kelly's "business man" was a myth, pure and simple, and that in making the arrest he acted upon suspicion and by reason of the fact that defendant is a Chinaman. It is inconceivable that one qualified to act as an investigator for the county attorney, and who had so acted for more than a year and was asked to state the information upon which the arrest was made, would overlook or forget the most important facts in his possession.

The fact that when Kelly drove up to the sidewalk and jumped out of his car, defendant put down the grip he was carrying is an unimportant fact; and that at some time, either at the time of the arrest or while he was being interviewed by the county attorney—the record does not disclose when—he called Kelly by name, is equally unimportant. Kelly was a well-known person, the county attorney's investigator, and no doubt known by many persons living in Butte. To justify the arrest on such flimsy and unimportant circumstances is like a drowning man grasping for a straw.

The principle involved is not whether the narcotic law shall be applied and enforced, but rather, shall the guaranties of our Constitution as to human rights and liberties be upheld? We fully realize the baleful influences upon society in consequence of the use of narcotics; and no one can appreciate more

the desirability of effectually stamping out the drug peddler by enforcing the law and punishing most severely those human vultures who seek to profit by reason of man's weakness with abandoned heart as to the consequences to the individual or to society. However, in our ardor to uphold and enforce such a salutary law, we must not transgress our constitutional guaranties of human liberties constituting the bulwark of our government. In the dissenting opinion of Mr. Justice Galen in the case of *State ex rel. Neville* v. *Mullen,* 63 Mont. 50, 207 Pac. 634, he denounced the arrest of persons without semblance of a warrant and on *mere suspicion;* and he has not since had occasion to change his views. In fact, he says that he is now even more pronounced in his convictions in that respect. In accord with the views expressed by the supreme court of the United States, we contend that it is the duty of the courts to be watchful of the constitutional rights of our people, and against stealthy encroachments thereof. (*Byars* v. *United States,* 273 U. S. 28, 71 L. Ed. 520, 47 Sup. Ct. Rep. 248; *Gouled* v. *United States,* 255 U. S. 298, 65 L. Ed. 647, 41 Sup. Ct. Rep. 261; *Boyd* v. *United States,* 116 U. S. 616, 29 L. Ed. 746, 6 Sup. Ct. Rep. 524; *State ex rel. Kuhr* v. *District Court,* 82 Mont. 515, 268 Pac. 501.) As was well and appropriately said by Mr. Justice Brandeis, dissenting, in the case of *Casey* v. *United States,* 276 U. S. 413, 72 L. Ed. 632, 48 Sup. Ct. Rep. 373: "I am aware that courts—mistaking social values and forgetting that a desirable end cannot justify foul means—have, in their zeal to punish, sanctioned the use of evidence obtained through criminal violation of property and personal rights, or by other practices of detectives more revolting." But such methods should be denounced by our courts to insure the stability of our form of government.

Section 3 of Article III of the Constitution of Montana provides: "All persons are born equally free, and have certain natural, essential, and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties, or acquiring, possessing, and protecting property, and of seeking and obtaining their safety and happiness in all law-

ful ways." If this means anything—and to all fair-minded and liberty-loving Americans it means much—it means that all men, whether Chinamen or of other national origin, are equal before the law and entitled to the same rights and privileges under like circumstances. As a result of this guaranty of our Constitution, every person is entitled to the same inalienable rights, the same fair treatment, and the same degree of justice, irrespective of race, creed or place of nativity. This is a fundamental principle of our government from its inception. Let it not be forgotten that in the Declaration of Independence it was solemnly proclaimed that "we hold these truths to be self-evident—that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."

The same protection is given our people against unwarranted arrest as against invasion of individual rights and liberties by search and seizure without a warrant. And an officer or individual citizen cannot justify an unreasonable seizure and search of the personal effects of a person by reason of an arrest on suspicion. They should not be permitted to indulge in such subterfuge, thus indirectly doing that which is directly prohibited. Section 7 of Article III of the Montana Constitution provides that *"the people shall be secure in their persons, papers, homes, and effects, from unreasonable searches and seizures, and no warrant to search any place or seize any person or thing shall issue without describing the place to be searched, or the person or thing to be seized, nor without probable cause, supported by oath or affirmation, reduced to writing."*

"The constitutional provision, both state and federal, against unreasonable search and seizure, applies to the person and his baggage and personal belongings (*Youman* v. *Commonwealth,* 189 Ky. 152, 13 A. L. R. 1303, 224 S. W. 860), and to the search of a person unlawfully arrested and the seizure of his personal belongings (*State* v. *Wills,* 91 W. Va. 659, 24 A. L. R. 1398, 114 S. E. 261). Any search and seizure which is unlawful is unreasonable. (*State* v.

*Wills,* supra; *State ex rel. King* v *District Court,* 70 Mont. 191, 224 Pac. 862.)'' (*State ex rel. Sadler* v. *District Court,* 70 Mont. 378, 225 Pac. 1000.) And an arrest or search which is unlawful in its inception is not made lawful by what is thereby found; hence the seizure of contraband articles, in the possession of a person after his unlawful arrest, is not justified by the fact that he was found to have such goods on his person or in his possession. (*State ex rel. King* v. *District Court,* 70 Mont. 191, 224 Pac. 862.)

In the case of *State ex rel. Samlin* v. *District Court,* 59 Mont. 600, 198 Pac. 362, Mr. Chief Justice Brantly for the court said: ''Speaking of the Fourth Amendment to the Constitution of the United States, Mr. Justice Day, in *Weeks* v. *United States,* 232 U. S. 383, Ann. Cas. 1915C, 1177, L. R. A. 1915B, 834, 58 L. Ed. 652, 34 Sup. Ct. Rep. 341 (see, also, Rose's U. S. Notes), said: 'The effect of the Fourth Amendment is to put the courts of the United States and federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers, and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all intrusted under our federal system with the enforcement of the laws. The tendency of those who execute the criminal laws of the country to obtain convictions by means of unlawful seizures and enforced confessions, the latter often after subjecting the accused persons to unwarranted practices destructive of rights secured by the federal Constitution, should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights.' This forceful statement of the learned Justice applies as well to the guaranty found in our own Constitution; for, except that the order in which the several clauses in it are arranged is different, it is expressive of

the same fundamental principles and was intended to be equally as effective to prevent an invasion of the rights of the citizen of the state under the guise of the law by the state government or any of its officers.''

The same principles apply to an arrest by an officer or a private citizen as to search and seizure without a warrant, i. e., in either case probable cause sufficient to justify an arrest or a search must be based on known facts or credible information and circumstances sufficient to justify a reasonable man in the belief that the law has been or is being violated. The facts and circumstances in the possession of the person making the arrest must be of such character and strength as to justify a magistrate in issuing either a warrant of arrest or a search-warrant. And an arrest, or search, or seizure on mere suspicion is never justified. The circumstances warranting the issuance of a search-warrant must be as strong as those which would justify the institution of a criminal charge *or the arrest of a person on such charge without a warrant;* that is to say, the belief must be founded on facts and circumstances which would justify a reasonably prudent man in acting without a warrant, or be such as would justify a magistrate in issuing a warrant. (*State ex rel. Stange* v. *District Court,* 71 Mont. 125, 227 Pac. 576; *State ex rel. Kuhr* v. *District Court,* supra.) And in order to entitle a private person to make an arrest under section 11754, Revised Codes 1921, for a public offense committed or attempted in his presence, the facts and circumstances must be such that upon them alone he would be justified in making a complaint upon which a warrant of arrest would issue.

Whether there was probable cause, and whether Kelly acted as a prudent and cautious person, is a question of law, and this court is not bound by the conclusion of the trial judge on that point. (*Michel* v. *Smith,* 188 Cal. 199, 205 Pac. 113; *Murphy* v. *Murray,* 74 Cal. App. 726, 241 Pac. 938.)

In our opinion, Kelly acted upon mere suspicion and in consequence the arrest was unlawful and the motion to suppress should have been sustained.