STATE, Respondent, *v.* MULLANEY, Appellant.

(No. 7,020.)

(Submitted October 14, 1932.   Decided November 22, 1932.)

[16 Pac. (2d) 407.)

554

*Mr. T. E. Downey* and *Mr. James H. Baldwin,* for Appellant, submitted a brief; *Mr. Baldwin* argued the cause orally.

556

*Mr. L. A. Foot,* Attorney General, and *Mr. S. R. Foot,* Assistant Attorney General, for the State, submitted a brief; the latter argued the case orally.

HONORABLE R. M. HATTERSLEY, District Judge, sitting in place of MR. JUSTICE FORD, disqualified, delivered the opinion of the court.

The defendant, M. J. Mullaney, has appealed from a judgment convicting him of possessing morphine, a felony.

The sole question presented in this case is whether the district court erred in refusing to suppress evidence used on the trial. Timely motion to suppress such evidence was made.

The only point for determination in this case is whether ▇ or not the arrest of the defendant was lawful. If it was, the search of defendant's person and seizure of the narcotics found on him were also lawful, and such evidence was properly admissible in evidence on the trial (*State ex rel. Neville* v. *Mullen,* 63 Mont. 50, 207 Pac. 634; *State ex rel. Kuhr* v. *District Court,* 82 Mont. 515, 268 Pac. 501; *State* v. *Hum Quock,* 89 Mont. 503, 300 Pac. 220); if not, the motion

to suppress the evidence should have been granted by the trial court.

The arrest was made on June 4, 1931, by one Larry Weir, ▆ the then sheriff of Silver Bow county, state of Montana without a warrant. On the hearing of the motion to suppress the evidence, Larry Weir testified: That some time in the latter part of April, 1931, one night about 11 o'clock, at the corner of Mercury and Main Streets, he noticed Mullaney's car driving around the block, blowing the horn, a long blow and three short blows, the car having an odd horn. Weir called up his office, and one Mr. Peoples came down, the two taking opposite sides of Dakota Street in the dark. The car kept pulling up to the corner or near the corner of Mercury and Dakota Streets, stopping and standing there for a few minutes, then pulling away. Finally another car drove up, at which time Peoples grabbed one car, Weir the other, when a bindle of cocaine was thrown out of the window, evidently the window of Mullaney's car, it being the only window of either car open on the side it was thrown. The car was occupied at that time by Grace Brown and defendant's wife, defendant not being present. The women were taken to the county jail, searched, nothing found on either, then were released. Earlier the same evening defendant had been in the car. That Weir was told by one "Blonde Babe" about the first part of May of the same year that "she had been getting her dope from the Mullaneys." This person lived at 55 E. Mercury Street, in a portion of the old restricted district of Butte. Weir had known her for a couple of months prior to arrest of defendant. Weir believed, but did not know, that she was a user of narcotics, having that appearance, and had such belief at the time of the arrest. That people of her type are not very reliable. That he (Weir) had numerous telephone calls from people in the vicinity of defendant and wife's residence in the city of Butte, who told "us" there were "dope heads" frequenting the Mullaney house, same being distant about two miles from the Silver City Club. The people calling said they were neighbors

of defendant and wife; none would give their names. The calls were not checked to see whether they were made by people living in the district of defendant's home. Witness did not see any of the persons calling. The calls were in the two months preceding the arrest, some being in April and some in May, 1931; those calling asked if witness knew where the Mullaneys lived, and, upon receiving an affirmative answer, told him that drug addicts had been going and coming from the Mullaney house on Amherst Street every day. Witness was acquainted with a place at 226 or 228 South Wyoming Street, where two drug addicts by name Irene Collins and Grace Brown lived. The Mullaney car made several trips there every night. Sometimes defendant and wife were in the car, sometimes defendant alone. This place is in the restricted district. That witness saw the Mullaney car at 228 South Wyoming Street about every night he was down that way, the last time being the night before June 4, either the defendant or his wife driving it. On reaching these premises, they would give a certain signal, a long blow and two or three short blows on the horn, and in a minute or two the door would open, and someone from the inside would run out to the car and run back in again; the car not stopping for any time without someone coming out. They either went in or someone always came out. That Weir personally saw the stopping of the car at this place, and heard the signal. There are records of Irene Collins and Grace Brown being "hop heads" or narcotic addicts. Prior to June 4, 1931, the defendant's car had been around the Silver City Club giving that signal, the club being another "hop head joint." The last time Weir saw the car going by the club was June 3, 1931, at about 12 o'clock. Prior to the arrest Weir had records under date of May, 1930, from the chief of police at Great Falls, Montana, showing defendant to be suspected of being a "dope peddler," at that time and place. After receiving the telephone calls and the information from "Blonde Babe," witness, for a period of approximately two months prior to the arrest, watched the defendant. Defendant's wife

had a sister by the name of Jess, a dope fiend. Defendant and wife frequented her house at different times during the night and early morning; also they had gone to 288 South Wyoming Street, and in and out of the Silver City Club, but at no time did Weir get close to them; this was always at night, after dark. Prior to the arrest, Weir had read a certain letter to the effect that the defendant and wife were in Yakima, Washington, for two days, and that they bought a can of morphine, paying $110 for it. Weir did not remember who signed the letter or to whom it was addressed, and could not find the letter in his office, stating it must have been destroyed. On return of defendant and wife from Yakima, Weir saw them again and watched them right along; they running to these different places, making from fifteen to twenty trips a day away from the Silver City Club, where Weir was informed they had quite a good many telephone calls each night. The Silver City Club is located at the corner of Silver and Main Streets, and is "a club where dope peddlers and hop fiends, and the riff-raff sort hang around." It is a colored club, and Weir had seen people there whom he knew to be drug addicts or "hop heads," some of such persons being negro prostitutes. That Weir talked to various members of the detective force of the city of Butte about defendant's reputation for being a dope peddler, and was told "he was one of the shrewdest dope peddlers there is." Weir was also told by street-car men and by a fireman that there had been "dope heads" getting on the street-car at the corner of Amherst Street. Various persons known to Weir to be drug addicts were arrested as drug addicts, one at the Silver City Club, and others were known to be frequenters of such club.

In regard to the circumstances at, or immediately prior to, the time of the arrest of defendant by Larry Weir, Weir further testified: That on the early morning of June 4, 1931—the morning of the arrest—at about 12:10 A. M. he saw the defendant driving north on Main Street in the city of Butte. Weir next saw the defendant at the corner of Silver and Main

Streets in Butte about 2:20 A. M., defendant having parked his car about 100 feet from the corner of Silver and Main Streets "over in the dark," the Silver City Club being at the northwest corner of such streets. That defendant came out of the club through the front door, first "poked his head out the door, looked north on Main Street, then south on Main Street, evidently didn't see anybody on the street, then ran to the corner of Silver and Main" and to his car, and, while unlocking the door of his car, defendant was arrested by Weir and his deputy.

This court has on various occasions heretofore set forth what are the requirements of a legal arrest without a warrant, and it is not necessary to again state such requirements. We are content to refer to and reaffirm the statements as to the law governing such matter in the following cases: *State ex rel. Neville* v. *Mullen,* supra; *State ex rel. Sadler* v. *District Court,* 70 Mont. 378, 225 Pac. 1000; *State ex rel. Kuhr* v. *District Court,* supra, and *State* v. *Hum Quock,* supra.

The constitutional provision, both state and federal, against unreasonable search and seizure, applies to the person and his baggage and personal belongings, and in the search of a person unlawfully arrested and the seizure of his personal belongings. Any search and seizure which is unlawful is unreasonable. (*State ex rel. Sadler* v. *District Court,* supra.)

This court, as stated in the last-mentioned case, has sufficiently reviewed the constitutional provisions and the application thereof in a case of this kind in the cases of *State ex rel. Samlin* v. *District Court,* 59 Mont. 600, 198 Pac. 362, *State ex rel. Neville* v. *Mullen,* supra, *State ex rel. Thibodeau* v. *District Court,* 70 Mont. 202, 224 Pac. 866, and *State ex rel. King* v. *District Court,* 70 Mont. 191, 224 Pac. 862, to which we again merely refer and reaffirm the views therein expressed.

The facts as shown by the evidence of Larry Weir, heretofore set forth, briefly summarized, are: (1) That the

defendant, prior to and at the time of the arrest, had the reputation of being a "dope peddler"; (2) that, prior to the time of the arrest, defendant associated with known drug addicts, visited places frequented by them, acted in a suspicious manner at various times, especially while driving his car, was connected with certain suspicious circumstances, was said to have purchased narcotics in another state; his car apparently was used by defendant's wife and another while the latter were in possession of narcotics, and one "Blonde Babe," about the 1st of May, 1931, informed Weir that "she had been getting her dope from the Mullaneys"; and (3) that at the time of the arrest, the defendant acted in a suspicious manner.

Proof of the general reputation of the defendant does not constitute probable cause for an arrest without a warrant. (*State ex rel. Hansen* v. *District Court,* 72 Mont. 245, 233 Pac. 126; *State ex rel. Stange* v. *District Court,* 71 Mont. 125, 227 Pac. 576.)

The evidence as to the conduct of the defendant prior to the time of the arrest, and information to the effect that at some time prior to June 4, 1931, the date of defendant's arrest, defendant had purchased narcotics in another state, and that one "Blonde Babe" had been getting her dope from the Mullaneys, presumably meaning defendant and his wife, referred to past transactions and formed no basis for the arrest without a warrant at the time stated. (*State ex rel. Hansen* v. *District Court,* supra; *State ex rel. Samlin* v. *District Court,* supra; *State ex rel. Stange* v. *District Court,* supra; *State ex rel. Sadler* v. *District Court,* supra.)

This brings us to the consideration as to whether or not at the time and place of the arrest of the defendant, on June 4, 1931, the arresting officer, under the circumstances then and there existing, had probable cause for such arrest. The evidence as to these circumstances has already been set forth.

The witness Larry Weir, on the hearing of the motion to suppress the evidence, testified as to his intention in making

the arrest of the defendant, that he had the defendant searched at the time of the arrest to find something to hold him on, and, if unsuccessful in the search, would not have bothered him, but would have let him go.

In this connection it is interesting to note the decision of Shaw, Chief Justice, in *Bacon* v. *Towne,* 4 Cush. (Mass.) 217 (a malicious prosecution case), as to probable cause, Justice Shaw stating therein that ''probable cause is such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested is guilty.'' (See, also, 22 Michigan Law Review, p. 695, and *State ex rel. Kuhr* v. *District Court,* 82 Mont. at page 519, 268 Pac. 501.)

The conduct of the defendant at the time, or immediately prior to the time, of his arrest, while possibly suspicious, might be explained on various grounds consistent with his innocence, and without question does not constitute probable cause for the arrest; neither, as stated before, were there any grounds of probable cause for such arrest shown by the evidence as to the prior conduct of the defendant; nor, as before stated, does proof of the general reputation of defendant constitute probable cause for the arrest. That the arrest was not accompanied by such a state of facts in the mind of the arresting officer as would lead him honestly to believe the defendant guilty, at that time and place, of a violation of the narcotic law, is shown also by his own testimony as to his intention in making such arrest.

The motion to suppress the evidence should have been granted by the trial court.

The judgment is accordingly reversed, and the cause remanded with directions to dismiss the action and discharge the defendant.

MR. CHIEF JUSTICE CALLAWAY and MR. JUSTICE MATTHEWS, concur.

MR. JUSTICE ANGSTMAN and HONORABLE LYMAN H. BENNETT, District Judge, sitting in place of MR. JUSTICE GALEN, disqualified:

We dissent. In our opinion, the essential facts here do not differ so materially from those in the case of *State* v. *Hum Quock*, 89 Mont. 503, 300 Pac. 220, as to compel a different conclusion. (And see *Houck* v. *State*, 106 Ohio St. 195, 140 N. E. 112.)